**ADVERSARY PROCEEDING 25-04013**

**AMENDED CIVIL RICO COMPLAINT**

# EXHIBIT A

**THE MOONEY REPORT**

# TERRENCE R. MOONEY, C.P.A.

Certified Public Accountant
**247 NEW JERSEY AVENUE**
**ABSECON, NEW JERSEY 08201**
Tel: 609-407-0056  Fax: 609-407-9956  E-Mail: tmooney@trmcpa.com

MEMBER OF
NEW JERSEY SOCIETY OF
CERTIFIED PUBLIC ACCOUNTANTS

MEMBER OF
AMERICAN INSTITUTE OF
CERTIFIED PUBLIC ACCOUNTANTS

## INDEPENDENT ACCOUNTANTS' REPORT
## ON APPLYING AGREED - UPON PROCEDURES

United Brotherhood of Carpenters and Joiners of America (UBC & JA)
212 Carpenters Union Way
Las Vegas, NV

We have performed the procedures enumerated below, which were agreed to by the UBC & JA solely to assist you in evaluating the compliance and accuracy of the St. Louis – Kansas City Carpenters Regional Council's (the Council's) financial records as they relate to Department of Labor (DOL) Labor Management Reporting and Disclosure Act (LMRDA) standards of practice. This best practice review will also rely on guidance from the UBC & JA's Constitution as well as Internal Revenue Service regulations.

The sufficiency of the procedures is solely the responsibility of the UBC & JA. Consequently, we make no representation regarding the sufficiency of the procedures described below either for the purpose for which this report has been requested or for any other purpose.

This report is intended solely for your use and should not be used by those who have not agreed to the procedures and taken responsibility for the sufficiency of the procedures or their purposes.

Our procedures and findings are as follows:

### OBJECTIVES

The objectives of the agreed-upon procedures were to:

- Determine if the Council's accounting procedures were effective and compliant.
- Determine if there were any recommendations to assist the Council in the preparation of their accounting records and/or year-end reports.

### BACKGROUND INFORMATION

The St. Louis – Kansas City Carpenters Regional Council is a Carpenters Regional Council located in St. Louis, MO. The Council provides operational support and good and welfare to the members of its region. Revenue is generated from the dues of its members and per capita for the majority of the Council's program cash flows. Additional revenues come from rental and investment income.

Page 1 of 14

**AGREED-UPON PROCEDURES:**

*We inspected the Council's accounting and voucher system to determine if the standards of care and compliance were being adhered to for the period July 1, 2018, to September 27, 2021 at which time the Council was dissolved and merged. We reviewed various transactions as reported in the Council's accounting system to determine whether the compliance standards were being met.*

Findings and Recommendations:

1) **Officers and Trustees**
   a) The trustee review of the books of record is inadequate. (Exhibit 1) Trustees do not review all bank accounts, the petty cash account, or any investment accounts. The trustees do not perform a monthly audit. This violates the UBC constitutional duties of the trustees.
   **We would have recommended that the trustees audit the books of record, including all bank and investment accounts monthly, as per the duties of the trustees per the UBC & JA Constitution (Pages 44 - 46, sections 40A, B, and C – Exhibit 2) and the DOL Ten Step Audit Guide for Local Unions.**
   b) The trustees have not been reviewing the detail activity and bank statements for the Market Recovery, Central Dues Collection, Payroll, Money Market, and Bass Tournament accounts.
   **We would have recommended that the trustees review all bank accounts of the Council.**
   c) The trustees have not been reviewing the political fund accounts.
   **We would have recommended that the trustees review all bank accounts of the PAC funds.**
   d) The trustees' signatures do not appear on the physical bank statements and investment statements indicating their review. They are only signing the reconciliation (Exhibit 1).
   **We would have recommended that the trustees sign the bank statements and investment statements per LMRDA standards of care.**
   e) The trustees do not review the petty cash receipts and disbursements or reconcile the petty cash prior to fund replenishment. This function is performed by employees of the Council.
   The DOL audit of June 30, 2018, found that the Council did not retain adequate documentation for all petty cash disbursements. It is the responsibility of the officers and trustees to ensure that these records are maintained.
   **Review of monthly petty cash transactions is the responsibility of the trustees.**
   f) Trustees are not reviewing the year end LM-2, Bond Report, Form 990, or financial statements with the auditor who prepares these reports/returns.
   **We would have recommended that the trustees meet with and review all the yearend reports/returns prepared by the outside auditing firm prior to signing or submitting to the DOL, IRS, and UBC.**
   g) EST Bond did not prepare quarterly reports for the Local Union as prescribed in the St Louis-Kansas City RC Bylaws dated July 9, 2019 page 4, section 8 (a)(b). – Exhibit 3)
   **Failure to prepare EST reports was a violation of the EST constitutional duties.**
   h) EST Bond did not prepare adequate minutes as prescribed in the St Louis-Kansas City RC Bylaws dated July 9, 2019 page 4, section 8 (a)(b), - Exhibit 3)
   **Failure to prepare accurate and complete minutes was a violation of the EST's constitutional duties.**

2) **PAC funds**
   a) The Council has a Political Action Committee (PAC) Fund. Carpenters Helping in the Political Process (CHIPP) is a Section 527 political action fund that makes contributions to candidates and

Page 2 of 14

political party committees. Little to no documentation of approval for political fund expenditures exists in minutes or otherwise.
**The approval of payments from the full committee is not documented.**
  b) In certain instances, Executive Secretary Treasurer (EST), Albert Bond, approved material candidate donations without the knowledge of, approval of, or discussion with the other members of the PAC Fund (Exhibit 4).
  **Written procedures needed to be established** for the disbursement and approval of PAC funds.

3) **Other related entity**
  a) The Council has another related entity, The Committee to Protect MO Families. This entity is a 501(c)4 organization whose purpose is to educate the public on the negative effects of right to work. Disbursement from this fund also had little to no documentation of approval.
  **The Council's executive board needed to review and memorialize in the board's minutes all material disbursements from any related funds.**

4) **Credit cards**
  a) Not all credit card transactions are supported by the appropriate receipt and/or documentation of business purpose. We found that receipts for meals did not always include the detail itemized receipt mandated by IRS regulations. Summary receipts were provided which does not meet the IRS or DOL requirements for meal receipts. This was also noted by the DOL in their audit of fiscal year end June 30, 2018 and has not been corrected.
  **We would have recommended that receipts are required to be submitted for all credit card transactions. Receipts for meals must include the itemized list of transactions. Failure to provide a receipt or appropriate business purpose should require that the employee reimburse the Council for the charge or that the charge be deducted from the employee's pay.**
  b) Some meals did not include an appropriate business purpose with enough detail and description. "lunch" is not an adequate description to fulfill IRS or DOL requirements. This was also noted by the DOL in their audit of fiscal year end June 30, 2018 and was not corrected.
  **We would have recommended that receipts for meals list all the persons dining, and the business purpose for the meal.**

5) **Recurring expenses**
  a) A monthly retainer in the amount of $2,000 has been paid to ▇▇▇▇▇▇ for the 36-month period of our review without any supporting invoice. There is additionally no trustee approval noted, and no record of services provided by ▇▇▇▇.
  **At a minimum, recurring payments require approval of the Executive Committee and should be recorded in the minutes.**
  b) A monthly retainer in the amount of $1,000 has been paid to ▇▇▇▇▇▇▇ for the 36-month period of our review without any supporting invoice. There is additionally no Trustee approval noted, and no record of services provided by ▇▇▇▇▇.
  **At a minimum, recurring payments require approval of the Executive Committee and should be recorded in the minutes.**

6) **Personal expenses**
  a) We found that EST Bond paid approximately $1,333.06 for his travel CPAP machine with the Council credit card (Exhibit 5)

Page 3 of 14

Payment of personal medical bills is not an approved, appropriate Council expense. **The Council should have had a credit card policy to prohibit personal use of the Council credit card. This expenditure should have been reimbursed to the Council by Al Bond.**

b) We found that payment of medical expenses in the amounts of $558, and $369, not covered by the Council's insurance policy for Brittany Bond, daughter of EST Albert Bond, were paid for by the Council (Exhibit 6).
**Payment of personal medical bills is not an approved, appropriate Council expense. This expenditure should have been reimbursed to the Council by Brittany Bond.**

7) <u>Season tickets</u>
   a) The Council bought season tickets to Fox Theater annually. Allegedly these tickets were used personally by EST Bond's wife. Total paid in 2018 and 2019 was $2,203 and $2,311, respectively (Exhibit 7).
   **These expenditures were not approved, appropriate Council expenses.**
   b) Seventeen gift cards totaling $850 were given out at a golf outing. No list of recipients was maintained.
   **Gift card usage should be very limited and well documented. They carry the same responsibility as cash and should be recorded as such. When they are used as prizes, the recipients of the gift cards and the means of selecting the winners should be documented.**
   c) The Council purchased various season tickets to sporting events including the St. Louis Cardinals, Kansas City Chiefs, Kansas City Royals, Gateway Grizzlies, St. Louis Blues and others (Exhibit 7b) totaling tens of thousands of dollars per year, approximately $88,000 in the fiscal year ended June 30, 2020. Additionally, the Council purchased advertising at the ballpark which entitled the Council the use of box seats for $62,000 in the same year. These tickets were controlled by the Administrative Assistant of the EST, Shawna Pastrana. Documentation of the use of these season tickets and box seats was inadequate. Most of the tickets/seats (four per game) were signed out by Business Representatives of the Council, and while the Business Representative's name was sometimes documented, the business purpose was not. Attendees were not documented, so even if the tickets were claimed by a Business Representative, there is no documentation as to who attended the events and why. This was also noted in the DOL audit of June 30, 2018. Some of the tickets were used for charitable donations. The recipient of the donation is noted, but there is no supporting letter from the charity to confirm receipt.
   **Season tickets to sporting events are articles of worth. They should be carefully inventoried, secured, and their use and users should be documented along with dates. If the attendees and business purpose test cannot be validated, then this should be allocated as a taxable fringe benefit to the recipient. If the tickets are given to charities, the Council should have requested a letter to document the receipt by the charitable organization.**

8) <u>Billboards</u>
   a) We found disbursements to Interrail Outdoor, LLC (Interrail) totaling $1,077,560 for construction of billboards in Wichita and Kansas City in the fiscal year ended June 30, 2020. The Council received invoices in fiscal year ended June 30, 2021 for Wichita, Kansas City, and St. Louis. These invoices are not supported by adequate documentation and/or approval by the officers and trustees. There is very little supporting documentation for the charges in the invoices (Exhibit 10). The initial construction agreement/contract was dated January 20, 2020 between the Council and Interrail and is signed by EST Albert Bond for the Council and ▮▮▮▮▮▮ for Interrail (Exhibit 8). The contract doesn't state any dollar amounts. The progress billings do not comply to industry standards for material construction projects of this type and amount. There is no detail of labor, material costs, or many of the other costs. The invoices have no indication of Trustee approval. In fact, the approval for the billboards was not documented in the Minutes of the Executive Committee until January 20, 2021 (Exhibit 9), more than one year from the date of the

first invoice from Interrail. By the date of approval of the expenditures, $2,999,678 had already been incurred and paid. The Minutes do not document the estimated total cost, set any limits on the total cost, or otherwise restrict the expenditure.

**Approval for items of a significant cost should have been secured from the Executive Committee prior to incurring those costs. The officers and trustees were negligent in their fiduciary duties as stewards of the members funds in not securing a contract stating the amount expected to be incurred prior to the start of work on the billboards. The trustees should be reviewing and approving each invoice as it is incurred and paid.**

b) Additional invoices to Interrail Outdoor, LLC totaling $2,957,798 were paid during the period July 1, 2020, through August 31, 2021, for a total of $4,035,358. Exhibit 11 is a schedule of the payments made on the three individual billboards. In summary, the costs to date are Wichita $1,147,749, Kansas City $1,612,299, and St. Louis $1,275,310 for a total of $4,035,358. As of August 31, 2021, only one of the three billboards was completed and installed (Wichita). The other two were still incomplete. Invoices for "installation" of the Kansas City and St. Louis billboards were received and paid in March of 2021 for $237,000 and $363,136 (Exhibit 12), respectively, even though these billboards are incomplete and stored in boxes in warehouses. **The officers and trustees did not fulfill their fiduciary duties as stewards of the members funds in not securing a contract prior to the start of work on the billboards. The trustees should be reviewing and approving each invoice as it is incurred and paid.**

c) We find that the cost of construction of these three billboards is not in line with the industry average. An independent request of billboard sign construction and installation contractors revealed that an average cost for a comparable billboard to those built by Interrail would be $552,000:

- ▮▮▮▮▮▮▮▮▮▮, located in Kansas City, MO, cost estimate $500,000-$600,000
- ▮▮▮▮▮▮▮▮▮▮, located in Cherry Hill, NJ, cost estimate of $500,000
- ▮▮▮▮▮▮, located in Farmingdale, NJ, cost estimate of $500,000, using supplied specifications for Kansas City board from Interrail
- ▮▮▮▮▮▮, located in St. Louis, MO, cost estimate for double-sided is $375,000 and cost estimate for single-sided is $285,000, using supplies specifications for St. Louis board from Interrail

All four companies are very experienced in outdoor digital message board construction and advertising. ▮▮▮▮, with an office in Kansas City, Missouri, had just finished a similar project at a cost of approximately $500,000.

**Officers of the Council should have requested legal representation concerning the overbilling of this contract with Interrail.**

d) Additionally, $37,200 was invoiced and paid for a "state permit" for the Kansas City billboard in March of 2020 (Exhibit 13). According to city officials, a permit has not been issued for the billboard in that location. ▮▮▮▮▮▮, the General Manager of ▮▮▮▮▮▮▮▮, as referenced above, stated that an additional problem exists with permitting in Kansas City. ▮▮▮▮▮▮ stated that the city passed an ordinance a few years ago that large signs of the size 48' X 14' (the size proposed by Interrail), that will have multiple advertisers, require the removal of three other billboards to construct one due to the fact that the city has too many existing large billboards. Also, the owner would be required to obtain both a city & state permit. If the owner is to only display their own message content, then only a city permit is required. Per the agreement between the Council and Foxpoint Interactive, LLC (Foxpoint), the billboard was to have multiple advertisers (Exhibit 14).

**The approval by EST Bond for these payments is a material deficiency based on both LMRDA standards and IRS Regulations. The standards of reasonable care have been violated. The officers and trustees were negligent in their fiduciary duties as stewards of the members funds in not researching the cost of constructing the billboards prior to approving**

the work. Estimates should have been obtained and comparisons made with other contractors in the industry.

e) The intention of the billboards as stated in the minutes January 20, 2021, was to help with recruitment and retention of members. However, an alternate reason appears to be to generate revenue through advertising. A signed agreement with no stated date, notarized June 30, 2021, exists between the Council and Foxpoint, granting Foxpoint control over selling and placing advertising on the billboards. As well, control over the revenue and expenditures (books of record) are handled by Foxpoint. Foxpoint is also 100% owned by the developer, ▮▮▮▮▮▮▮▮▮▮, of Interrail. In exchange, the Council will receive 70% of the **net** revenue of Foxpoint for the first seven years and 60% for years 8 through 32. Subsequent to this agreement, a First Amendment dated August 6, 2021, was signed referencing the initial agreement of July 6, 2020, of which we do not have a copy. This First Amendment added a section granting 60 hours per month of advertising time to the Council at no cost, and the design and creation of a total of 3 advertisements per calendar month by Foxpoint at no additional cost to the Council. In comparison, digital advertising costs on an existing message board in the Kansas City market was quoted by Lamar at $3,500 - $5,000 per 4-week period.
**We find that this activity is an unrelated business activity that would have generated taxable income for the Council. This activity is not in accordance with the non-profit purpose of the Council.** The profit-sharing agreement based on **net revenue,** controlled by Foxpoint, is not a favorable position for the Council who has no control over expenditures.

f) We also found that the Interrail invoices were paid using grant funds received from the UBC&JA. The original grant agreement stated that the funds would be used for **advertising on** billboards at an approximate cost of $20,000 per month. The original grant agreement does not indicate that the funds would be used for **construction of** the billboards.
**Use of the UBC&JA grant funds to construct the billboards is not in accordance with the original grant purpose.**

g) The Council did not have insurance to cover the billboards until August 21, 2021, and only covering the Wichita billboard. This lapse of coverage on millions of dollars of assets was negligent (Exhibit 15)
**The officers and trustees needed to ensure proper insurance of all Council assets as part of their fiduciary responsibility.**

9) **Market Recovery Plan**

The Market Recovery Plan (MRP) for the St. Louis Council of Carpenters is broken into five parts.
1. Market Recovery Fund Expense Program aka Target Fund
2. Market Recovery Loan Program
3. Letters of Credit Program
4. Union Stimulus Program
5. Shared Union Stimulus

**Market Recovery Fund Expense Program**
Purpose: To provide direct cash payments through a market recovery program. To qualify for these payments, the following procedures must be followed: (Exhibit 16)
- Provide the information requested on the Market Recovery Funds Request form with at least (3) business days' notice (Exhibit 17)
- Market Recovery monies are paid only after project completion.
- At job end, company must submit a letter stating that the project for which funds were issued is complete, along with a detailed report of the carpenters who worked on the project, with the specific number of hours worked by each, to your appropriate coordinator.

- Any violation of the collective bargaining agreement voids the Market Recovery money award.
- Company may not hire non-union subcontractors.
- Company employees may not work with non-union carpenters under any circumstances.

a) The Council had outstanding Market Recovery Fund Expense Program commitments as of June 30, 2021, of approximately $3,032,538 for MO and IL, and $3,119,082 for Kansas City, total $6,151,620. The total Market Recovery Plan funds available to meet these commitments (including the operating account and all investments) as of June 30, 2021, were $5,864,947. Therefore, the Council pledged $466,653 in excess of available funds to meet these commitments as of June 30, 2021.
   **Procedures for pledging Market Recovery Plan funds needed to be improved. The EST and/or Assistant EST had sole discretion over making commitments. Consultation with the Chief Financial Officer or Business Representatives was not being made to ensure funds are available to meet commitments.**
b) Business Representatives actively involved with union jobs targeted for the Market Recovery Fund Expense Program were not involved in the process of granting funds to contractors or ensuring that the funds were used for the intended purpose. In certain cases, the Business Representatives were not even aware that the contractor received Market Recovery Fund monies.
   **The Business Representatives should have been involved in the Market Recovery Fund Expense Program process and should have been directed to monitor the use of Market Recovery funds to ensure that the members benefit.**
c) Market Recovery funds were issued to contractors who were delinquent in their benefit payments. During the period of our review, the Council paid three contractors Market Recovery funds while those contractors were delinquent on their benefits in the amount of $40,945. (Exhibit 18a). These contractors were ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ was placed on the delinquency list in February of 2020 and did not come off the delinquency list until February of 2021. In that time frame, they were paid four Market Recovery Fund distributions totaling $33,630. Exhibit 19 is a complete list of delinquent contractors.
   **Contractors who are delinquent in their benefit payments should not have received additional Market Recovery funds. Market Recovery funds should be payable directly to the union benefit fund.**
d) The Council disbursed Market Recovery funds to contractors <u>prior</u> to the completion of the job in some cases. This was in violation of their own policy. In fact, less than 10% of all contractors who received Market Recovery funds provided a letter of job completion and yet they all received funds.
   **Market Recovery funds should only be disbursed at the conclusion of the job for which the funds were approved.**
e) The Council disbursed Market Recovery funds to contractors who did not provide adequate support of hours worked. Sometimes no hours were submitted, and in other instances only the total hours were submitted without documentation of employee names and hours per employee.
   **The Council repeatedly violated their own policies with regard to the Market Recovery funds. Funds should not have been disbursed without documentation of hours worked.**
f) Approval letters were not obtained for all Market Recovery fund disbursements (Exhibit 18b).
   **The Council does not have documentation for approval of Market Recovery fund disbursements by appropriate Council personnel.**
g) Market Recovery funds were disbursed in a lump sum within days of the fund request with no backup paperwork, no hours, and no letter of completion. This disbursement was approved via memorandum by Assistant EST, Don Brussel. (Exhibit 20).

Market Recovery funds are not supposed to be disbursed in lump sums. They were designed to be a reimbursement of hours worked. Proper procedures were not followed for this disbursement.

h) More than half of the Market Recovery Fund Request forms were not properly completed. Multiple forms had no approval, no job completion date, no estimated number of hours, and no amount of funds per hour. Market Recovery funds were disbursed to these contractors despite the fact that the request forms were incomplete (Exhibit 18b)

**The Council did not adhere to its own policy for Market Recovery fund disbursement and did not act within the best interests of its members. The Council should have had a fiduciary responsibility to handle the members funds with prudence.**

i) We found that many of the Market Recovery Fund disbursements were paid by the Controller based on invoice submissions without the approval of the officers. The proper approvals according to the Market Recovery Fund policy were not obtained.

**The Controller is not authorized to pay Market Recovery Funds prior to approval. This violates the policies and procedures established by the Council.**

### Market Recovery Loan Program

Purpose: To provide to contractors to develop jobs, cash flow for wages and benefits, and entice the organization of nonunion contractors to convert to a signatory contractor with union assistance. See Exhibit 21 for Market Recovery Loan Program Procedures.

j) According to the loan policy, interest is to be assessed on the loans. No accruals for interest have been recorded in the Controller's loan schedule, general ledger, or on the LM-2 or financial statements.

**Failure to accrue this interest is an understatement of assets on the LM-2 and financial statements.**

k) Each year, decisions are made about the collectability of the contractor loans and certain amounts are written off as bad debts. These decisions were made autonomously by the Controller without consultation with officers and the Executive Committee. During the period of our review, $1,386,444 in loans were written off (Exhibit 22).

**Decisions about the collectability of contractor loans should be done in consultation with the officers and the Executive Committee and documented in writing.**

l) A loan was provided to ▇▇▇▇▇▇▇▇ for $150,000 to start a residential electrical business. Mr. Grasso was formerly employed by the Council as a Business Representative. ▇▇▇▇▇▇▇▇ defaulted on the loan after only one payment of interest and principal. The loan was then written off as uncollectible by the Controller without any other approvals.

**The Controller should not have been written off without the consent of the Executive Committee.**

m) The Council provided a loan to Alterra Worldwide on January 20, 2021 for $200,000 with the balance coming due July 20, 2022. The Council granted another loan for $500,000 on August 6, 2021 to the same contractor for the payment of delinquent real estate taxes. Market Recovery loans were supposed to be used to assist contractors with the financing or sale of union-built projects (Exhibit 21). Alterra Worldwide was given this second loan from the Council, due December 31, 2021, before any payments were received on the first loan. (Exhibit 23)

**This contractor was granted a loan for a purpose other than the specified purpose of the Market Recovery Fund Loan Program. He was also granted an additional loan within 8 months without having made any payments on the first loan. This was a misuse of member assets. Furthermore, these loans are unsecured and put the member funds at greater risk of loss.**

n) The Council front loaded labor and benefits up to 80% for contractors whom they are trying to organize. The loan program was used for this purpose, but the loans were unsecured and resulted

in material default and loss of member assets.
**The Market Recovery loans should have been secured by the assets of the receiving contractor. Failure to secure the loans was an irresponsible use of member assets.**

o) For a majority of the Market Recovery loans, the Checklist of Market Recovery Documents to be obtained from borrowers were not completed (Exhibit 24).
**The Council failed to adhere to its own policy for loaning funds to contractors demonstrating another lack of due diligence and care for members' funds.**

### Letters of Credit Program
Purpose: To provide security on contractor loans with banking institutions. There were various banks providing these loans that the Council secured with members' assets. These letters of credit were to be released at the completion of the specific project. The banks mandated the council put aside collateral for this security. The Council charged the Contractor 2% per year, plus the 1% fee to annually renew the line of credit.

p) As of June 30, 2021, the amount of contractors' debt was $6,863,847 which required security of over $7,000,000 by the Council (Exhibits 25a & 25b). These guarantees were secured by two investment accounts of the Council's General Fund totaling $17,395,741. While the funds pledged to the bank are sufficient to meet the letter of credit guarantees, they are not Market Recovery Funds. The Council used General Funds in pledge against Market Recovery Fund activities. There were not sufficient Market Recovery Funds to cover these guarantees on letters of credit.
**Procedures for guaranteeing contractor's debt via letters of credit needed to be improved. The EST and/or Assistant EST had sole discretion over making guarantees. Additionally, the Council should not pledge more than it has available in Market Recovery Funds.**

q) The contractors for whom guarantees on letter of credit are made should be assessed 2% interest and a 1% annual renewal fee due to the Council on the outstanding balance of their loan that is guaranteed by the Council. There are no accruals of the interest or fees on the LM-2 or financial statements.
**Failure to accrue the interest and fees is an understatement of assets on the LM-2 and financial statements.**

r) Letters of credit have expiration dates that are not being adhered to. Jobs have been completed and the letters of credit have not been released. Some of the letters of credit have been secured for 8-10 years. Some projects have no specified project release date.
**Letters of credit should be released once the job for which they were obtained is completed.**

s) The is no collateral from the contractors securing the letters of credit. The Council is putting its members' assets at risk with no security. At the end of our period of review, there was one letter of credit for $500,000 securing a loan to Goodson-Good Hub in default with the bank (Exhibit 25a).
**Procedures for guaranteeing the debts of contractors via letter of credit needed to be improved. The EST and/or Assistant EST have sole discretion over making guarantees. Additionally, the Council should not have pledge more than it has available in Market Recovery Funds.**

t) There are entities that received both letters of credit and Market Recovery Fund loans from the Council. Both commitments are unsecured. This puts members' funds at a high risk of loss.
**The Council did not use members' funds with the care and diligence required of its fiduciary responsibility.**

### Union Stimulus Program
Purpose: This program was designed to produce incentive for contractors to build union, as well as to market union products to home buyers. Vouchers of $2,500 are provided to the homebuyer via the contractor which the homebuyer can then redeem at closing against closing costs. When

the vouchers were presented to the title company, the title company would seek reimbursement from the Council for the redeemed vouchers.

u) Outstanding vouchers as of June 30, 2021, totaled $115,000. The contingent liability for the Union Stimulus vouchers outstanding as of June 30, 2021, was not stated in the notes to the LM-2 or in the notes to the financial statements.
**The contingent liability for the Union Stimulus vouchers should be reported in both the LM-2 and financial statements.**

v) During 2021, the Council provided non-union companies with stimulus vouchers as an incentive for converting to a union signature contractor. The labor checkoff resulting from these non-union entities was not sufficient to cover the cost of the vouchers issued.
**The use of the members' funds in this manner was not prudent. It did not yield a sufficient payoff to justify the use, and in fact yielded a loss of member assets.**

### Shared Union Stimulus Program

Purpose: Various labor organizations provided support to 100% union-built homes by union contractors. These funds are incentive funding payments not to be repaid and provided after closing, based on a sliding scale of sales price. The distribution of these funds is made by ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, the major recipient of these funds.

w) In the 2021 year of our review, only three union carpenter contractors received funds totaling $1,071,411.
**The benefit to only three carpenter contractors is not a reasonable or prudent use of union funds. It opens the Council to claims of unfairness from other Union contractors**

x) The disbursement of these funds is not calculated or determined by the union entities, but by the contractor receiving most of these funds.
**This process should have been reviewed and administrated by a union labor organization, not the recipient of the funds.**

## 10) Member Loans

a) Loans have been extended to employees and members of the Council. The LMRDA prohibits loans to employees more than $2,000 but prohibits loans to members in any amount. The UBC Constitution prohibits loans to members and all employees who are deemed members (Exhibit 26). Loans of $5,000 was made to member "Overall" and another for $3,041 to member "Smith" for "Employee Assistance" during the fiscal year ended June 30, 2021 (Exhibit 27). These loans were approved by EST Bond.
**Section 503 of the LMRDA states, "any person who willfully violates this section shall be fined not more than $5,000 or imprisoned for not more than one year, or both." As a repeat offender, the likelihood of fine, imprisonment, or both increases.**

## 11) Salaries and Benefits

a) The Council did not maintain adequate documentation for the salaries of officers and employees. The Council could not provide bylaws or Executive Committee minutes to verify salaries and benefits. This was noted by the DOL in their audit of 2018 and has not been corrected.
**Salary authorizations should be recorded in the minutes of the Executive Committee.**

b) EST Albert Bond was granted a salary increase at the Executive Committee meeting January 20, 2021, to be equal to the base salary of 2018 with a 3% increase for each year after that. There is no mention of a **retroactive adjustment** or catch-up payment. A salary was calculated for EST Bond as per the minutes, and additionally EST Bond received a retroactive adjustment for 2019,

2020 and the first three weeks of 2021 in the amount of $17,899.02 based on that formula (Exhibit 28).
**This retroactive adjustment was not authorized by the Executive Committee or the delegates of the Council. Retroactive salary increases are not reasonable or prudent and violate Council practice at that time.**

c) ███████, daughter of EST Bond has been employed by the Council since March 19, 2018. She started as a part time employee of the Council at $20.00 per hour in the front office. March 23, 2018 she became a full time employee at $50,000 per year. June 25, 2018 she became Assistant EST Brussels assistant at $55,000 per year. Subsequently her salary changes were as follows:
- September 3, 2018    $60,000
- December 3, 2018     $65,000
- May 3, 2019          $66,518

On September 9, 2019, she moved from the Council office to the Wellness Center for an annual salary of $75,000. Subsequent salary changes were as follows:
- May 4, 2020    $80,000
- May 3, 2021    $85,000

Approvals for these salaries and subsequent increases are not in the minutes of the Council. These raises and salaries are not consistent with other employees of the Wellness Center who have additional qualifications and licenses that ███ does not have (Exhibit 29).
**All salaries and increases needed to be approved by the Executive Committee and recorded in the minutes.**

d) Certain employees are receiving an additional five hours per week toward their pension and annuity credits (Exhibit 30). No written policy exists to document who qualifies for this additional benefit. ███████ also receives this additional benefit even though she is working for the Wellness Center. Her salary is being paid by the Council and not the benefit funds office.
**The Council should have documented the qualifications for all employee benefit policies.**

e) The Council has an undocumented "medical insurance for life" program it has administered for over 30 years. The staff understanding was that all Business Representatives and the EST, Asst. EST, and the Director of Organizing, and their spouses qualified for this benefit. More recently, two employees who are not Business Representatives were granted medical benefits in retirement up to age 65, and two other employees received medical benefits for life as part of a settlement package. There is no written policy stating who qualifies for medical benefits in retirement or otherwise, and for what period of time (Exhibit 31).
**This arbitrary assignment of medical benefits to retirees opens the Council up to claims of unfairness. A written policy needed to be memorialized.**

f) Employee, Martin Walter, is a not a member of the UBC&JA. The Council contributed to the UBC&JA International pension on his behalf. Contributions for non-members to the pension fund can only be made if a participation agreement exists between the Council and the UBC&JA International pension fund. No such agreement can be provided by the Council.
**The Council needed to memorialize a participation agreement to validate these payments.**

12) **General**

a) In general, the disbursements of the Council lack a proper trail of approval. In most cases, trustee approval, Market Recovery committee approval, EST approvals, etc. are not documented. In several instances we were told there was an email approval, but it could not be produced. There are too many verbal approvals without the proper documentation.
**The lack of proper documentation of approval may leave the Controller open to claims of fraud, illegal acts, and improper use of member funds.** All disbursements needed to be approved in writing by the appropriate individuals, whether it is the trustees, or the Market Recovery fund committee, or other designated individuals prior to issuing the checks. The officers and trustees did not perform their fiduciary responsibilities in safeguarding the

assets of the members.

*We inspected Forms LM-2, Forms 990, UBC Annual Bond Reports and financial statements for the fiscal years ending June 30, 2018, 2019, and 2020. The reports for June 30, 2021, were not available as of the date of our review, with the exception of the LM-2 and the bond report, which were available. We reviewed the accuracy of these submissions as they related to the accounting records as well as the stated information provided in the returns.*

Findings and Recommendations:

a) The LM-2 and the Notes to the Financial Statements should disclose the contingent liability for pledged Market Recovery Funds and Union Stimulus vouchers.
**We recommend that Question 17 on page 2 of the LM-2 should be answered "yes", and the amount of the pledged Market Recovery Funds and Union Stimulus vouchers as of June 30, 2021, should be disclosed along with the letters of credit guarantees that were disclosed. Furthermore, disclosure of this contingent liability should be included in the footnotes to the financial statements.**

b) The LM-2 understated the amount of the Market Recovery letters of credit guaranteed by $2,000,000. The LM-2 states $4,863,847, but there was an additional $500,000 guaranteed that should have expired but was not removed from the bank records and there was an additional $1,500,000 to ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ that did not appear in the Controller's list, but should also be included. (Exhibits 25a & 25b).
**Careful review of all the amounts and statements in the LM-2 needed to be performed by all the responsible officers prior to filing. Consultation with the Controller and Assistant Controller may be necessary to ensure amounts are correctly reported.**

c) Season tickets to sporting and theater events were disclosed on the LM-2 on Schedule 17- Contributions, Gifts and Grants.
**Although a small portion of the sporting event tickets were donated to charitable organizations, the large majority were utilized by Business Representatives. While the true use of these tickets is undocumented, the intention for their use was Representation Activities which would be disclosed on Schedule 15.**

d) The annual holiday party of the Council was recorded on Schedule 17- Contributions, Gifts and Grants.
**The annual holiday party should be disclosed on Schedule 18 – General Overhead.**

e) Schedule C was not completed and included in the 2020 990. There are questions on Schedule C that should be answered that are not completed.
**We recommend that Form 990, Part I-C line 5e and Part III-A be completed.**

f) On Schedule C of the 990, the Council needed to answer whether or not it expended more than $2,000 for lobbying during the year being reported. There are hundreds of thousands of dollars designated as payments to a "lobbyist" on the LM-2. These questions are not answered.
**The Council had an obligation to report to its members that percentage of dues which are allocable to political or lobbying expenditures. Failure to provide this information to members, can result in a proxy tax to the Council.**

g) The UBC Annual Bond Report was not signed by all of the appropriate officers and/or trustees. In several years, Albert Bond's signature appears for several positions. Additionally, a signature stamp was used for EST Bond's signature(s).
**All the requested officers and trustees should have signed the Bond Report with original**

      signatures to indicate their review of the Bond Report prior to filing with the UBC.

h) Indirect disbursements for officers and employees for auto insurance reimbursement and direct disbursements for mileage and meal reimbursements are recorded on the LM-2 on Schedules 11 and 12 in column (E) Allowances Disbursed.
   **These should be recorded in column (F) Disbursements for Official Business since the reimbursement of auto insurance expense, mileage and meals should only occur with proper supporting documentation of the official business purpose. Otherwise, the Council would be required to include these amounts in taxable wages.**

i) The Council did not properly report the value of items given away during the year in Item 15 on the LM-2. This was also noted in the DOL audit of 2018 and has not been corrected.
   **The Council should have reported the dollar value of hats, shirts, etc. given away. Additionally, the value of the sporting event season tickets, theater tickets, and gift cards given away should be stated as well as who received these items.**

j) The Controller's loan schedule, which was updated every six months, was not calculating correctly, resulting in incorrect loan balances having been reported on financial statements and understating the assets reported on the LM-2, 990 and UBC&JA.
   **The officers and trustees signing these reports had a responsibility to ensure the accuracy of the numbers reported.**

k) The investment in STRAQR is reported on the June 30, 2019 bond report as $42,000. The correct value as of that date was $420,000 (Exhibit 32).
   **This represents an understatement of assets of $378,000. The officers and trustees who signed the bond report had an obligation to review the amounts presented and certify their accuracy.**

l) Martin Walter was listed as a Business Representative on Schedule 12 – Employees on the June 30, 2021 LM-2. This is not correct. He was in-house counsel.
   **The correct employee titles should be used for the LM-2. The review of the LM-2 is the responsibility of the officers and trustees.**

m) The Council has a Scholarship Fund with a separate EIN that files its own 990 EZ. This Scholarship Fund is disclosed as a related party on the Council's 990, but not on the LM-2 in answer to question 11(b). Also, the cash account for the Scholarship Fund is not included in the Council's Bond Report.
   **The Scholarship Fund should be disclosed on the LM-2 in answer to question 11(b). The cash account of the Scholarship Fund should be included in the Council's Bond Report. Failure to include the cash account results in risk of loss due to theft.**

*We inspected the Bylaws, personnel and related policies, and meeting minutes for consistency with the accounting records.*

Findings and Recommendations:

a) No written policies exist for petty cash, credit cards, travel reimbursement, investments, drug testing, disaster recovery plan, or charitable donations/sponsorships. Also, while there are policies for the some of the Market Recovery Plan programs: the Letters of Credit and Union Stimulus programs do not have written policies.
   **We would have recommended that the Council establish written policies for the items listed and review and update on a regular basis.**

b) The Bylaws of the Council do not state amounts for Officer and Trustee compensation for attending meetings and/or stipends for Delegates. These amounts are also not stated in the Employee Handbook.
   **We would have recommended that the Bylaws and/or the Employee Handbook include rates**

of reimbursement and/or stipends for meetings for officers, trustees, delegates, and others, as applicable.

c) Loans were forgiven for less than their full value during the period we inspected. No documentation of the loan forgiveness is in the Executive Committee meeting minutes.
**We recommend that all significant financial actions of the Executive Committee be recorded in the minutes. Executive Committee meeting minutes do not contain enough pertinent information.**

d) Several decisions of the Officers and Executive Committee are being made via email discussions. Decisions about allowing retirees or terminated employees to retain their medical benefits have been matters for email discussions and are not documented in the minutes.
**We would have recommended that all of the decisions of the Executive Committee be documented in the minutes. If these decisions happen via email, they should subsequently be recorded in the minutes. Emails are not a substitute for minutes.**

*We inspected the Council's records as they relate to the Internal Revenue Code issues of subcontractors, unrelated business income and filing questions.*

There were no findings with respect to the reporting of subcontractors, unrelated business income, and filing questions other than as noted above.

We were not engaged to and did not perform an audit, the objective of which would be the expression of an opinion on the specified elements, accounts, or items. Accordingly, we do not express such an opinion. Had we performed additional procedures, other matters might have come to our attention that would have been reported to you.

This report is intended solely for the use and information of the UBC, and is not intended to and should not be used by those who have not agreed to the procedures and taken responsibility for the sufficiency of the procedures or their purposes.

If you have any questions, please contact my office.

*[signature]*

Terrence R. Mooney, CPA
October 27, 2021

Page 14 of 14

| MARKET RECOVERY FUND | | | |
|---|---|---|---|
| LOAN WRITE OFFS FROM 7-1-2018 THROUGH 6-30-2021 | | | |
| PER THE LM-2 - DO NOT AGREE TO CONTROLLER SCHEDULE | | | |
| CONTRACTOR | DATES | | |
|  | 6/30/2021 | 6/30/2020 | 6/30/2019 |
| BAM CONTRACTING | $184 | | |
| BRYDIE | | $343,303 | |
| GRASSO ELECTRIC | | $150,000 | |
| ILMO CONTRACTING | | $11,396 | $23,597 |
| NET ZERO LLC | $857,964 | | |
| TOTAL PER YEAR | $858,148 | $504,699 | $23,597 |
| TOTAL OF ALL 3 YEARS | $1,386,444 | | |

EXHIBIT 22